STATE of Wisconsin, Plaintiff-Respondent,

v.

Roger Fay DEETS, Defendant-Appellant.

Court of Appeals

*No. 93–1174–CR. Submitted on briefs January 6, 1994.—Decided September 22, 1994.*

(Also reported in 523 N.W.2d 180.)

For the plaintiff-appellant the cause was submitted on the brief of *James E. Doyle*, attorney general, with *James M. Freimuth*, assistant attorney general.

For the defendant-respondent the cause was submitted on the brief of *Tod O. Daniel* of Janesville.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

GARTZKE, P.J. The State appeals from a pretrial order suppressing statements Roger Deets made to a detective on grounds that police coercion produced them. We conclude that no coercive police conduct occurred, and therefore reverse the order.

Two criminal cases against Deets were consolidated for trial. In one case, Deets is charged with seven counts of first-degree sexual assault of a child, § 948.02(1), STATS., five of which involved alleged sex-

ual contact with K.L.M.,[1] and two of which involved alleged sexual contact with S.L.S. In the other case, Deets is charged with two additional counts of first-degree sexual assault of K.L.M. Deets pleaded not guilty to all the charges.

Before the charges were filed, Detective Flood of the Rock County Sheriff's Department interrogated Deets. After the charges were filed, Deets moved to suppress all statements he made to Flood during that interrogation. At the conclusion of an evidentiary hearing, the trial court found "evidence of improper and coercive police conduct" in three particulars. First, during the course of the interrogation, the detective expressed dissatisfaction with Deets's answers and told Deets he should think about the consequences and ramifications of obstructing the investigation. Second, although Flood made no promise of leniency, he suggested that if Deets did not cooperate, the district attorney would look at the case differently. Third, the detective suggested that if Deets did not cooperate and the victims were forced to testify, the victims (Deets's stepdaughter and her friend) would suffer great trauma. The court concluded that in view of its three findings, it was unable to find beyond a reasonable doubt that Deets's inculpatory statements to the detective were voluntary. It held that the statements were the result of improper police pressure, and therefore suppressed them.

---

[1] Because one of the alleged sexual contacts with K.L.M. allegedly occurred after she attained the age of thirteen, the State should have charged second-degree, rather than first-degree, sexual assault on that count. Section 948.02(1) and (2), STATS.

Under the Fifth Amendment to the United States Constitution, a defendant's involuntary statements are inadmissible to prove his or her guilt on the charged offense, and this prohibition applies to state criminal defendants through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). As we said in *State v. Pheil*, 152 Wis. 2d 523, 535, 449 N.W.2d 858, 863 (Ct. App. 1989), "The fourteenth amendment prohibits involuntary statements because of their inherent unreliability and the judicial system's unwillingness to tolerate illegal police behavior."

When government coercion is at issue, we review the trial court's factual findings to determine whether they are clearly erroneous. *State v. Clappes*, 136 Wis. 2d 222, 235, 401 N.W.2d 759, 765 (1987). That is unnecessary in the case before us because the State concedes the accuracy of the trial court's three factual findings. Because the historical facts have been established, we independently determine whether they constitute coercive conduct. *Id.* We make that determination as an appellate court "in order to ensure that the scope of constitutional protections does not vary from case to case." *State v. Turner*, 136 Wis. 2d 333, 344, 401 N.W.2d 827, 832 (1987).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment," *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), but coercive activity does not, in and of itself, establish involuntariness. As we said in *Pheil*, 152 Wis. 2d at 535, 449 N.W.2d at 863,

"[d]etermination of whether a statement is voluntary requires a balancing of the personal characteristics of the defendant against the coercive or improper police pressures." Thus, a trial court should not undertake the balancing analysis unless some improper or coercive police conduct has occurred. *Id.*; *Clappes*, 136 Wis. 2d at 239-40, 401 N.W.2d at 767.

For that reason we examine the trial court's three factual findings to determine whether they justify the conclusion that the detective acted coercively. We conclude that they do not.

Deets furnishes no citation to support the conclusion that the detective telling Deets he should think about the consequences of obstructing the investigation shows a coercive practice. An officer may express dissatisfaction with a defendant's responses during an interrogation. The officer need not sit by and say nothing when the person provides answers of which the officer is skeptical. Knowingly obstructing an officer who is acting in an official capacity and with lawful authority is a misdemeanor. Section 946.41(1), STATS. Obstruction includes knowingly giving false information to an officer. Section 946.41(2)(a). Deets was not told that if he continued to give answers, which in the opinion of the detective were false, he would be charged with that crime. We hold that the trial court's first factual finding does not show coercive conduct.

The trial court's second finding is no basis for the conclusion that coercive conduct occurred. An officer telling a defendant that his cooperation would be to his benefit is not coercive conduct, at least so long as leniency is not promised. *State v. Cydzik*, 60 Wis. 2d 683, 692, 211 N.W.2d 421, 427 (1973). Similarly, coercive

conduct does not occur when, as here, an officer, without promising leniency, tells a defendant that if he or she does not cooperate the prosecutor will look upon the case differently. In either case, the officer does nothing other than predict what the prosecutor will do, without making a promise one way or the other.[2]

Nor does the trial court's third finding justify the conclusion that coercive conduct occurred. The suggestion that unless Deets cooperated the alleged victims would be forced to testify and would suffer great trauma was a reasonable prediction. A person in Deets's position need not be told that if a trial is necessary the alleged victims will testify he sexually assaulted them, and that the experience will be traumatic.

Because the trial court's factual findings do not justify the conclusion that the police acted coercively, we reverse the order suppressing Deets's statements.

*By the Court.*—Order reversed and matter remanded for further proceedings.

SUNDBY, J. (*dissenting*). The trial court found evidence of improper and coercive police conduct in three particulars and suppressed statements that defendant, Roger Deets, made to a detective. The State concedes the accuracy of the trial court's factual determinations. Those were as follows. First, the detective interrogating Deets told him that he was obstructing the investigation of the case and he should think about the consequences of that obstruction. Second, the detective told Deets that if he did not cooperate, the

---

[2] Contrary to Deets's assertion, the detective's statement was not a threat of penalty.

district attorney would look at the case differently. And third, the detective suggested that if Deets forced the victims, Deets's stepdaughter and her friend, to testify, they would suffer great trauma.

The majority concludes as a matter of law that these three instances do not add up to coercive police activity. I disagree. Certainly, the cumulative effect of the detective's interrogation was to coerce Deets's statements.

The majority bases its conclusion on a statement of the United States Supreme Court in *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), where the court said: "We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."

The Court did not define what constituted "coercive police activity." It noted, however, that police interrogators have turned away from such interrogation techniques as interrogating a defendant, on medication, for over eighteen hours without food or sleep, *Greenwald v. Wisconsin*, 390 U.S. 519 (1968); holding a gun to the head of a wounded confessant to extract a confession, *Beecher v. Alabama*, 389 U.S. 35 (1967); engaging in sixteen days of incommunicado interrogation in a closed cell without windows, and with limited food, *Davis v. North Carolina*, 384 U.S. 737 (1966); holding a defendant for four days without adequate food or medical attention, *Reck v. Pate*, 367 U.S. 433 (1961); conducting five days of repeated questioning during which police employed coercive tactics, *Culombe v. Connecticut*, 367 U.S. 568 (1961); holding a defendant incommunicado for three days with little food, and informing defendant that the chief of police was preparing to admit a lynch mob into the jail, *Payne*

*v. Arkansas*, 356 U.S. 560 (1958); and questioning defendant by relays of officers for thirty-six hours without sleep, *Ashcraft v. Tennessee*, 322 U.S. 143 (1944). *Connelly*, 479 U.S. at 163 & n.1.

The *Connelly* Court noted that police interrogators have turned to more subtle forms of psychological persuasion. 479 U.S. at 164. Psychological persuasion can be just as effective in obtaining a defendant's confession as the tactics described in the above cases.

This point is illustrated in a number of cases. In *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), the court determined that FBI agents used coercive tactics to secure a confession, and accordingly, ruled the confession involuntary. The facts in *Tingle* resemble, in some respects, the facts in this case. The defendant, who worked at a credit union, was found at the credit union bound and gagged; the credit union had been robbed. FBI agents escorted the defendant to their car, where they questioned her for approximately one hour. After the defendant told the agents what had happened and after she waived her *Miranda* rights, the FBI agents accused her of lying. The agents apparently believed that the defendant, with the help of others, had carried out the robbery. *Id.* at 1333. Acting on this belief, the agents explained to the defendant the number of "crimes [of] which she might be guilty." *Id.* at 1333-34. They told her that she faced "a twenty year sentence for bank robbery, twenty-five years if it was armed robbery, five years for conspiracy, five years for lying to a federal agent, and an additional potential penalty of five years if [she] were to lie to a grand jury." *Id.* at 1334. The agents further stated that it would be in her "best interest to cooperate." *Id.* They said that if she cooperated, they would inform the prosecutor of this cooperation; however, if she failed to cooperate,

they would tell the prosecutor that she was "stubborn or hard-headed." *Id.* The agents also *suggested* that the defendant's boyfriend had implicated the defendant as the chief planner of the crime. Finally, the agents told the defendant that she *might* not see her two-year-old child for a while if she went to prison. *Id.* As a result of the foregoing, the defendant confessed.

In its analysis, the *Tingle* court stated that a "defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . ." *Id.* (quoting *Jackson v. Denno*, 378 U.S. 368, 376 (1964)). The Court also enumerated the reasons for excluding a coerced confession:

> First, confessions obtained in a coercive manner are likely to be unreliable. More important, involuntary confessions are forbidden
>
>> because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will," *Blackburn v. Alabama*, 361 U.S. 199, 206-07 [1960], and because of "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York*, 360 U.S. 315, 320-21 [1959].

*Tingle*, 658 F.2d at 1334-35 (quoting *Jackson*, 378 U.S. at 386) (part of citations omitted). The court further

stated that to be voluntary, a confession must be "the product of a rational intellect and a free will." *Id.* at 1335 (quoting *Blackburn*, 361 U.S. at 208). The *Tingle* court then discussed the Fifth Amendment in relation to "involuntary confessions":

> The fifth amendment secures "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). Consequently, a confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Id.* at 7 (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).
>
> A confession is involuntary whether coerced by physical intimidation or *psychological pressure. Townsend v. Sain*, 372 U.S. 293, 307 (1963). Law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. *Subtle psychological coercion suffices as well, and at times more effectively, to overbear "a rational intellect and a free will."* As the Supreme Court noted in *Malloy*, "[w]e have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." 378 U.S. at 7 (citing *Haynes v. Washington*, 373 U.S. 503 (1963)).

*Tingle*, 658 F.2d at 1335 (emphasis added) (part of citations omitted).

Applying the foregoing law to the facts, the *Tingle* court decided that,

> the purpose and objective of the interrogation was to cause [the defendant] to fear that, if she failed to

641

cooperate, she would not see her young child for a long time. . . . The relationship between parent and child embodies a primordial and fundamental value of our society. When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit "cooperation," they exert the "improper influence" proscribed by *Malloy*. The warnings that a lengthy prison term could be imposed, that [the defendant] had a lot at stake, that her cooperation would be communicated to the prosecutor, that her failure to cooperate would be similarly communicated, and that she might not see her two-year-old child for a while must be read together, as they were intended to be, and as they would reasonably be understood. Viewed in that light, [the agents'] statements were patently coercive.

*Id.* at 1336 (footnotes omitted). Considering the totality of the circumstances, the court concluded that this psychological coercion produced the confession, and therefore, the confession was not " 'the product of a rational intellect and a free will' and was involuntary." *Id.* at 1337.

The Supreme Court of Iowa reached a similar result in *State v. Quintero*, 480 N.W.2d 50 (Iowa 1992). In that case, the defendant and his three nephews were arrested on narcotics charges. After the arrest, an investigating officer told the defendant that he and his nephews might be harmed in prison, and implied that his nephews could be physically and sexually abused in prison. The officer also speculated that unless the defendant's statements "matched those of his nephews, he would anger the judge and jury and suffer greater punishment." *Id.* at 50.

The Iowa court determined that the officer's statements plainly constituted coercion. *Id.* The court then held that where, "as here, it clearly appears a confession is induced by force, threats, or other improper inducements, the question is one of law for the court alone, and the statements should not be admitted into evidence." *Id.* at 51.

The Supreme Court of Colorado in *People v. Freeman*, 668 P.2d 1371 (Colo. 1983), ruled in a like manner. In *Freeman*, the defendant was arrested for a variety of crimes, and after waiving his *Miranda* rights, agreed to talk with police officers. *Id.* at 1376. The officers eventually accused the defendant of murder; the officers then attempted to "persuade" the defendant to confess:

> On numerous occasions the officers referred to [the defendant's stepbrother's] involvement in the crimes and indicated that he would face murder charges "unless somebody else has got enough guts to stand up and say what really happened." They indicated that [the stepbrother] "didn't want to go back to prison," and falsely stated that he had implicated the defendant in [the] murder. The officers also appealed to the defendant's sympathy for [the victim's] family, stating "they know she is dead. They want to find her, can you show us where she is. . . . It doesn't make any difference to you at all other than — you know maybe it would be a good thing." The defendant responded, "yeah, get time in the can," to which an officer replied, "for one or ten — it doesn't make any difference — you know that as well as I do. If you do one stickup, if you do ten stickups, you get the same time."

*Id.* At this point, the defendant confessed to the murder.

The *Freeman* court explained that involuntary confessions may be excluded for reasons other than their unreliability:

> Involuntary statements are excluded from evidence "not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system — a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth."

*Id.* at 1378 (quoting *People v. Raffaelli*, 647 P.2d 230, 235 (Colo. 1982) (quoting *Rogers v. Richmond*, 365 U.S. 534, 541 (1961))).

The court then noted that "[p]sychological as well as physical pressures may be brought to bear on a suspect to induce his confession, and under some circumstances may render it involuntary." *Id.* at 1379. After reviewing the facts of the case under the "totality of the circumstances" test, the court concluded that "the coercive atmosphere surrounding this particular interrogation . . . caused the defendant's confession to be involuntary." *Id.* at 1380.

Finally, in *People v. Denney*, 199 Cal. Rptr. 623 (Ct. App. 1984), a California Court of Appeals faced circumstances similar to those confronted in the above cases. In *Denney*, the defendant, along with others, was involved in a felony-murder in which he accidentally shot the victim during a robbery. One of the defendant's accomplices told the police about the crime and identified all the guilty parties in exchange for immunity. When the police questioned the defendant, the

officers informed him that his accomplice had identified him in exchange for immunity. *Id.* at 624-25. The police officers then told the defendant a "hypothetical" story: "They said that in another 'accidental' felony/homicide, the actual triggerman cooperated and received a five-year manslaughter sentence; while those who refused to cooperate got life in prison without parole." *Id.* at 625. At this juncture, the officers *mirandized* the defendant who, according to the defendant, requested an attorney but was "talked . . . out of it" by the officers and eventually confessed. *Id.* at 625, 628.

In determining the outcome of the case, the *Denney* court cited most of the legal principles regarding involuntary confessions that were cited in the cases discussed above. *See id.* at 629. Moreover, the court reviewed the principles concerning "implied promises of leniency or benefits":

> The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. Thus, "advice or exhortation by a police officer to an accused to 'tell the truth' or that 'it would be better to tell the truth' *unaccompanied by either a threat or a promise*, does not render a subsequent confession involuntary. . . ."
>
> When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect bene-

645

> fits in the nature of more lenient treatment at the
> hands of the police, prosecution or court in consider-
> ation of making a statement, even a truthful one,
> such motivation is deemed to render the statement
> involuntary and inadmissible. The offer or promise
> of such benefit need not be expressed, but may be
> implied from equivocal language not otherwise
> made clear.

*Id.* at 629-30 (quoting *People v. Hill*, 426 P.2d 908 (Cal. 1967)) (citations omitted). The *Denney* court also stated that "the accused's statement must be entirely self-motivated: 'If the pressure or inducement was "a motivating cause" of the decision to confess, the confession is involuntary and inadmissible as a matter of law.' " *Id.* at 630 (quoting *People v. Thompson*, 611 P.2d 883 (Cal. 1980)).

Applying these principles to all of the facts in the case, the court concluded that the confession was involuntary and was obtained by official misconduct. *Id.* at 631.

The word "voluntary" has no "trade" meaning. The cases I have cited are consistent with a dictionary definition of "voluntary." According to WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, "voluntary" means "proceeding from the will," or "given of one's own free will." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2564 (1976). Plainly, Deets's statements were not the product of his "own free will." I therefore dissent.